**JOHN B. SANFILIPPO & SON, INC., Plaintiff,**

v.

**CONSOLIDATED RAIL CORPORATION, Defendant.**

No. 86 C 5277.

United States District Court, N.D. Illinois, E.D.

May 18, 1987.

Sam Panger, Jr., Katz, Karacic & Helmin, Chicago, Ill., for plaintiff.

Gary W. Fresen, Baker & McKenzie, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

John B. Sanfilippo & Son, Inc. ("Sanfilippo") has sued Consolidated Rail Corporation ("Conrail") under the Carmack Amendment, 49 U.S.C. § 11707. Sanfilippo alleges it is entitled under a bill of lading to damages caused by Conrail's failure to deliver Sanfilippo's goods with reasonable dispatch and in good condition. Now Conrail has moved for summary judgment under Fed.R.Civ.P. ("Rule") 56. For the reasons explained in this memorandum opinion and order, Conrail's motion is granted.

### Facts [1]

Sanfilippo received a September 2, 1983 order from the United States Department of Agriculture ("USDA") for 935 cases of peanut butter ("Order # 1"), for which Sanfilippo was paid $28,436.92 (¶¶ 3, 11). Order # 1 was to be delivered to the State of Pennsylvania Department of General Services (c/o York Storage and Ice Co.) in York, Pennsylvania (C. Att. 1). Sanfilippo then received a second USDA order

---

1. Rule 56 principles impose on the party moving for summary judgment the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett,* —— U.S. ——, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)). For that purpose this Court draws all "reasonable inferences, not every conceivable inference" in the light most favorable to the nonmovant—in this case Sanfilippo (*DeValk Lincoln Mercury, Inc. v. Ford Motor Co.,* 811 F.2d 326, 329 (7th Cir.1987)). Citations to the Complaint will take the form "¶ —." Citations to the parties' submissions will take the form "S." (for Sanfilippo) or "C." (for Conrail) followed by the name of the document. Finally, Conrail has tendered a Statement of Facts in Support of its Motion for Summary Judgment ("Statement") under this District Court's General Rule 12(e). Much of the Statement is drawn from the affidavit (cited "D'Orlando Aff. ¶—" or, in the case of the "At-tachments" verified by that affidavit, "C. Att.—") of John W. D'Orlando, Conrail's manager of freight claims. D'Orlando provides a "narrative" of what happened, followed by the statement (D'Orlando Aff. ¶ 6):

> In support of the statements made in the above narrative, the affiant authenticates the following documents as business records maintained in the usual course of business at Conrail:

It might perhaps be argued that D'Orlando's affidavit was not entirely "made on personal knowledge" or that to the same extent D'Orlando "is [not] competent to testify to the matters stated therein" (Rule 56(e)). But because Sanfilippo has not responded with a "Statement of Genuine Issues" under General Rule 12(f), none of those questions has been placed in issue, and the matters set forth in the Statement are deemed admitted under that General Rule.

for 800 more cases of peanut butter ("Order #2"), this time to be delivered to a consignee for the same government agency in Philadelphia, Pennsylvania (D'Orlando Aff. ¶ 5).

On November 9, 1983 Sanfilippo entered into a contract, employing the "Straight Bill of Lading—Short Form" (the "Bill of Lading"), with Illinois common carrier Conrail for shipment of Order #1 by rail from Chicago, Illinois to York, Pennsylvania (¶¶ 4, 5 and Ex. A).[2] Bill of Lading § 2 provides in part:

> (a) No carrier is bound to transport said property by any particular train or vessel, or in time for any particular market or otherwise than with reasonable dispatch....
>
> (b) As a condition precedent to recovery, claims must be filed in writing with the receiving or delivering carrier, or carrier issuing this bill of lading, or carrier on whose line the loss, damage, injury or delay occurred, within nine months after delivery of the property (or, in case of export traffic, within nine months after delivery at port of export) or, in case of failure to make delivery, then within nine months after reasonable time for delivery has elapsed; ... Where claims are

not filed or suits are not instituted thereon in accordance with the foregoing provisions, no carrier hereunder shall be liable, and such claims will not be paid.

On that same date Sanfilippo delivered Order #1 to Conrail for shipment (¶ 7).[3] Order #1 and Order #2 were loaded into the same railroad car for shipment (C. Att. 2), but the car was not delivered as scheduled for delivery of Order #1 in York, Pennsylvania (C. Att. 4). Instead the car went directly to Philadelphia (arriving there November 21), where Order #2 was unloaded December 5 (C. Att. 6). Next day the railroad car was returned to Conrail designated as "empty," even though Order #1 still remained in the car (C. Att. 6). After receiving the railroad car, Conrail returned it to C & NW, which then placed the car in storage (C. Att. 7).

On December 12, 1984 (sic—a full year later) a C & NW employee discovered Order #1 on the railroad car, and an investigation was begun. That led to the January 11, 1985 delivery of Order #1 to York, Pennsylvania—some 14 months after the order had been shipped (C. Att. 9). There the consignee rejected the peanut butter, stating in a January 16, 1985 "leased wire" (S. Mem. Ex. A):[4]

---

**2.** As implied by the term "Short Form," the Bill of Lading incorporates by reference the terms and conditions of the "Uniform Straight Bill of Lading" (¶ 6 and Ex. C).

**3.** Statement ¶ 11 says Sanfilippo's "shipper" delivered the railroad car containing Order #1 to the Chicago and Northwestern Transportation Company ("C & NW"), which in turn transferred the car to Conrail November 17, 1983.

**4.** With the same disregard for applicable rules reflected by their noncompliance with this District Court's General Rule 12(f) applicable to all summary judgment motions, counsel for Sanfilippo totally ignore the Rule 56(e) requirement that such motions be responded to by affidavit. Instead they simply attach unverified, unauthenticated "Exhibits" to the legal memorandum filed in response to Conrail's properly filed motion and supporting papers. This Court would be well within its rights (and the mandate of Rule 56) if it ignored Sanfilippo's "factual" submissions entirely, but in all candor it is simply not worth the time and trouble to compel compliance with the Rule. Accordingly the Memorandum Exhibits will be accepted at face value. All the same, some recognition should be given

to such cavalier treatment of a lawyer's responsibility to live by the rules, exemplified also by two added earlier violations that—though minor—display the same kind of inattentive lawyering:

> 1. This District Court's General Rules 3.14(c) and 3.10(a) require all lawyers' filings to be by individual names, not by firm name. Sanfilippo's counsel have ignored that requirement from the beginning.
>
> 2. Rule 7(a) neither calls for nor permits (except with specific court approval) a plaintiff to file a reply other than to a defendant's counterclaim. That specifically excludes a reply to affirmative defenses raised in an answer, yet Sanfilippo's counsel cluttered the court file with just such an unbidden reply. Again it would have taken more time than it was worth (and still another piece of paper—a court order) to have stricken the pleading from the file, so this Court left matters alone.

Under all the circumstances, the minimal appropriate response to counsel's overall conduct appears to be the publication of this opinion with this footnote intact (rather than edited out, as this Court has sometimes done in other cases with comments critical of lawyers' conduct).

We hereby reject to Conrail approximately 935 cases of peanut butter in 6/# 10 cans in car CNW 161762 because of damage and age of product.

That damage is described in a January 14, 1985 Conrail Inspection Report (S. Mem. Ex. C):

Bond cases are toppled or spread L/W of car and some are creased or lightly crushed.... Few cases are creased or slightly compressed at A end wall. Noted few cases with oil stained exterior. Few cases with flaps open have rusty cans inside. Damaged cases checked have 1–4 dented cans/case.

As for the age of the product, the consignee said in a March 1, 1985 mailgram (C. Att. 12):

Product is now 15 months old. Average shelf life under normal storage conditions is approximately 18 months. Consumption rate may probably extend beyond 18 month period. Good quality of product cannot be assured to the time product will be used.

On January 28, 1985 USDA filed a written claim (dated January 22, 1985) with Conrail under Section 2(b), seeking to recover the $28,436.92 value of Order # 1 (S. Mem. Ex. B; Statement ¶ 20). On May 20, 1985 Conrail denied the claim (¶ 13). In the meantime Conrail had sold Order # 1 for its salvage value and had paid the sale proceeds ($13,801.19) to USDA (¶ 11). Thus USDA now claims reimbursement from Sanfilippo of $14,635.73 (the amount USDA paid Sanfilippo less the salvage value Conrail paid USDA) (id.). Sanfilippo filed this action to recover that amount from Conrail under Section 2(b).

### Contentions of the Parties

■ Conrail moves for summary judgment on the ground Sanfilippo's claim is barred under Section 2(b). That section specifies two different timetables:

1. It requires claims to be filed "within nine months after delivery of the property."

5. D'Orlando reasons:
    1. Order # 2 was delivered to Philadelphia, Pennsylvania November 21, 1983.

2. "In case of failure to make delivery," however, claims must be filed "within nine months after reasonable time for delivery has elapsed."

Conrail asserts (based on D'Orlando Aff. ¶¶ 7 and 8),[5] and Sanfilippo does not dispute, that a reasonable time for delivery elapsed December 21, 1983. When no delivery was made by that date, the nine month limitation period "in case of failure to make delivery" began to run, barring any claims after September 21, 1984. Thus, Conrail reasons, Sanfilippo's January 28, 1985 claim is barred.

Sanfilippo disagrees. It urges there was no "failure to make delivery" because delivery was in fact made January 11, 1985—albeit more than a year after a reasonable time for delivery had elapsed. Therefore Sanfilippo says it had nine months from that date to file its claim, and it did so.

### Construction of Section 2(b)

In a way, each litigant seeks either to read some added language into Section 2(b) or to distort its normal sense. To make the alternative contractual timetables mutually exclusive, Conrail effectively adds a gloss to "delivery" in one of those alternatives—as though Section 2(b) said the claim must be filed:

within nine months after delivery of the property [in accordance with the contract—that is, "with reasonable dispatch" or "within a reasonable time"] ... or, in case of failure to make delivery [within such reasonable time], then within nine months after reasonable time for delivery has elapsed....

Conversely, Sanfilippo would permit the time clock to run twice in case of a stale delivery: once "after reasonable time to make delivery has elapsed" and again "after delivery" (even though that latter event could occur months or even years later). In somewhat more familiar drafting terms, Conrail would have the contract read as though it spoke in terms of nine months

2. "Reasonable time" for delivery is no more than 30 days after expected delivery.

after the *earlier* of the designated events (delivery or lapse of reasonable time without delivery), while Sanfilippo would have it speak in terms of nine months after the *later* of those same two events. For better or worse, neither "earlier" nor "later" appears in the contract. In construing Section 2(b) to resolve the dispute, this Court must (as with any contract) attempt to ascertain and effectuate the parties' intent as expressed in the writing (13 Am.Jur.2d *Carriers* § 280, at 784 (1964)).[6]

On that score Section 2(b)'s purpose is plain: to outlaw stale claims. After all, the timely filing of claims enables carriers not only to investigate those claims while the trail is still fresh, but also to minimize damages—or sometimes to eliminate them entirely. As C.Mem. 5–6 explains, had Sanfilippo notified Conrail when Order # 1 was not delivered, Conrail could have begun an investigation to locate the peanut butter before it had aged several months.

To effectuate Section 2(b)'s purpose, it must be read in what has to be perceived as its normal sense—as referring to the *earlier* of the two events. Put another way, the contractual term "delivery" in case of *actual* delivery must be construed to mean delivery as required under the contract: that is, delivery "with reasonable dispatch." Under that construction no stale claims could be filed in any event:

1. If actual delivery takes place with reasonable dispatch, claims are barred nine months from that delivery date.

2. If actual delivery does not take place with reasonable dispatch, there has been a "failure to make delivery," and claims are barred nine months after a reasonable time for delivery has elapsed.[7]

In contrast, were "delivery" construed to mean the tendering of goods to the consignee at *any* time, Section 2(b) would be ineffective in barring stale claims in the second of those situations. Even after nine months from a reasonable time for delivery had elapsed, the potential for future delivery of the goods would persist. It could *never* be said with certainty that there had been a "failure to make delivery." That being so, claims could potentially be filed (if the goods were eventually delivered) long after those claims had become stale. Indeed Sanfilippo could have filed its claim as late as October 11, 1985—almost two years after Order # 1's reasonable delivery date.

Construction of "delivery" in Section 2(b) to mean delivery as required under the contract is also consistent with the Su-

---

**6.** This Court is of course equally aware of the general principle requiring bills of lading to be construed strictly against the carrier, whether under contract-of-adhesion principles or otherwise (*id.*). But for the reasons explained in the text analysis, that kind of fallback principle never comes into play here.

**7.** Conrail Mem. 3–4 offers a different line of analysis, suggesting the applicable limitation period depends on the nature of the claim. As Conrail would have it:

　　1. Sanfilippo's claim is one for damage due to delay (the aging of the product).
　　2. Therefore the claim is for delay in delivery.
　　3. Sorkin, *How To Recover for Loss or Damage to Goods in Transit* § 7.02[2] (1976) (emphasis added) says:
　　If the claim is for failure to make delivery *or for delay in delivery,* the uniform bills of lading provide that the time for filing a claim with the carrier commences after a reasonable time for delivery has elapsed.
But Sorkin provides no analysis or case law in support of that reading of Section 2(b), if it means to limit the rule to a particular type of claim. On the other hand, it may be that Sorkin's statement means to embrace any kind of claim (for example, spoilage of perishable goods) that stems from delay—after all, the very next sentence in the Sorkin text appears to contrast "misdelivery" with "delivery to one other than the consignee" (citing the *Blish Milling* case discussed later in this opinion). In any event, as this opinion construes Section 2(b) it is not the type of claim that governs when the nine month limitation period accrues, but rather—just as Section 2(b) itself says—whether there has been an actual delivery or a "failure to make delivery." Such a failure occurs as soon as a reasonable time for delivery elapses, barring *all* claims filed more than nine months later. Thus, even were Sanfilippo to have filed a later claim only for physical damage to Order # 1 not caused by the delay in shipment, the claim would be barred. Of course, Sorkin is right (even if read in Conrail's narrow way) in the sense that a claim for delay (failure to deliver within a reasonable time) perforce means there has been a "failure to make delivery."

preme Court's decision in *Georgia, Florida & Alabama Railway Co. v. Blish Milling Co.*, 241 U.S. 190, 36 S.Ct. 541, 60 L.Ed. 948 (1916). There the Court construed time-limitation provisions in a bill of lading directly akin to those in Section 2(b),[8] and it found delivery to someone other than the consignee designated in the bill of lading did not constitute a "delivery" (*id.* at 195, 36 S.Ct. at 543):

> The clause with respect to the notice of claims—upon which the plaintiff in error relies in its second contention—specifically covers "failure to make delivery." It is said that this is not to be deemed to include a case where there was not only failure to deliver to the consignee, but actual delivery to another, or delivery in violation of instructions. But "delivery" must mean delivery as required by the contract, and the terms of the stipulation are comprehensive,—fully adequate in their literal and natural meaning to cover all cases where the delivery has not been made as required. When the goods have been misdelivered there is as clearly a "failure to make delivery" as when the goods have been lost or destroyed....

Thus Sorkin at § 7.02[2] (immediately after the language quoted in n. 7 of this opinion) cites *Blish Milling* for this proposition:

> Delivery means delivery as required by the contract. And that proposition gives Section 2(b) the same meaning this opinion ascribes to it.

Sanfilippo proffers two arguments against construing "delivery" in a way that would bar its claim:

1. Sanfilippo had no notice delivery had been delayed or Order # 1 had been damaged until January 1985. It would be unreasonable to interpret Section 2(b) to require a shipper to file a claim before it had discovered or reasonably could have discovered its right to file a claim (S.Mem. 2–3).[9]

2. Conrail had a common-law duty to notify Sanfilippo when the railcar missed its York, Pennsylvania stop and should not profit from its negligent failure to do so (S.Mem. 3–5).

Although Conrail responds only to the second of those arguments, neither one averts summary judgment.

Where goods are *never* tendered (even late) to the consignee, Section 2(b) is unambiguous in barring claims after nine months from a reasonable time for delivery has elapsed—whether or not the shipper has actual notice of nondelivery. Thus had Conrail never tendered Order # 1 to the consignee, Sanfilippo's claim would definitely have been barred under Section 2(b). Nonetheless Sanfilippo urges it would be unreasonable to construe Section 2(b) to require the same result here, simply because Order # 1 was later tendered to the consignee in a damaged condition.

True enough, Sanfilippo could not reasonably have discovered the *physical damage* to Order # 1 before the order was delivered January 11, 1985.[10] But that fact does not excuse Sanfilippo's nonfiling of a timely claim for the failure to deliver Order # 1 in the first place. As for Sanfilippo's plea that it had no notice Order # 1 had not been delivered with reasonable dispatch, Sanfilippo suggests no reason why it could not have discovered that fact simply by communicating with USDA sometime after December 21, 1983.[11]

---

**8.** That provision said (241 U.S. at 194, 36 S.Ct. at 543):

> Claims for loss, damage, or delay must be made in writing to the carrier at the point of delivery or at the point of origin within four months after the delivery of the property, or, in case of failure to make delivery, then within four months after a reasonable time for delivery has elapsed. Unless claims are so made, the carrier shall not be liable.

**9.** S.Mem. 2 notes USDA had prepaid Sanfilippo for Order # 1, so Sanfilippo had no reason to believe the order had not been delivered as scheduled.

**10.** S.Mem. 5–6 reasons that damage may not even have occurred until *after* nine months from a reasonable time for delivery had elapsed.

**11.** Of course it may be more typical for customers to communicate with their shippers when goods (especially those already paid for) are not delivered as scheduled. But the allocation of responsibility in that respect is within the control of the parties, not the carrier. No reason has been advanced for creating an extracontractual duty on a general carrier of goods, such as Conrail, when the party directly interested in

Sanfilippo is also wrong in asserting Conrail had a common-law duty to notify it when the railcar missed its York, Pennsylvania stop. As C.Mem. 4–10 explains, Sanfilippo's authority on that point establishes a carrier's duty to notify a shipper in two situations, neither of which exists here:

1. Where goods are tendered to the consignee within the time allowed for delivery but are not accepted, so the goods remain in the carrier's possession, some courts have held the carrier has a duty to notify the shipper of the consignee's lack of acceptance (to allow the shipper to resell the goods to someone else at the destination before the market price changes or the goods perish) (e.g., *Tri-State Produce Co. v. Chicago, B. & Q.R. Co.*, 104 F.Supp. 452, 457–58, 460 (N.D. Iowa 1952)).

2. Where a shipper requests service of the carrier and the carrier knows there will be a delay in shipment for some reason, the carrier has a duty to notify the shipper of the expected delay so the shipper may elect to use an alternative mode of transportation (see Sorkin at § 12.05 and cases cited there).

Those lines of authority do not establish Conrail had a duty to notify Sanfilippo when Order # 1 was not delivered to the consignee with reasonable dispatch.

In sum, because "delivery" in Section 2(b) means delivery with reasonable dispatch as required under the contract, this Court finds that as of December 21, 1983 there was a "failure to make delivery." Sanfilippo was then barred from filing any claim—even for physical damage to Order # 1 not due to aging—after September 21, 1984. That expired timetable was not replaced with a brand new one by the January 11, 1985 tendering of Order # 1 to the consignee.

### Conclusion

There is no genuine issue of material fact, and Conrail is entitled to a judgment as a matter of law. This action is dismissed.

the specific transaction—Sanfilippo—could readily have made arrangements to inform itself whether or not everything had gone ahead as planned.