724 F.Supp. 269 (1989)
ACTION DRUG COMPANY, INC., Plaintiff,
v.
OVERNITE TRANSPORTATION COMPANY, Defendant.
Civ. A. No. 88-482-JLL.
United States District Court, D. Delaware.
October 23, 1989.
*270 J. Dallas Winslow, Jr., Wilmington, Del., and John A. Guernsey, of DeStefano & Guernsey, Philadelphia, Pa., of counsel, for plaintiff.
Robert G. Carey, Wilmington, Del., for defendant.

MEMORANDUM OPINION
LATCHUM, Senior District Judge.

I. INTRODUCTION AND FACTUAL BACKGROUND
Plaintiff, Action Drug Company ("Action"), has brought suit against defendant, Overnite Transportation Company ("Overnite"), in order to recover the value of goods tendered to Overnite for delivery to a company in Florida. (Docket Item ["D.I."] 1 at ¶ 3; see also D.I. 4 at ¶ 3.) Overnite has brought a counterclaim seeking freight charges allegedly owed by Action. (D.I. 4 at ¶ 15; cf. D.I. 5 at ¶ 15.) Both parties have moved for summary judgment. (See D.I. 10; D.I. 13.) This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 & 1337(a) (West Supp.1989), as this case arises under 49 U.S.C. § 11707 (West Supp.1989), the Carmack Amendment to the Interstate Commerce Act.
The facts are as follows.[1] On September 5, 1986, in New Castle, Delaware, Overnite received from Action 615 cases of health and beauty aids. (D.I. 10 at 1; D.I. 14 at 2.) Overnite was to deliver these goods to the Walgreen Company in Orlando, Florida. (Id.)
The goods proceeded from New Castle, Delaware, through Overnite's terminals in Elkton, Maryland, and Graffney, South Carolina, eventually arriving at the Overnite terminal in Orlando, Florida. (D.I. 10 at ¶ 3; D.I. 14 at 2.) They were scheduled for delivery to Walgreen on September 18, 1988. (Id.) It was standard practice for Action to require Overnite to submit to it a signed proof of delivery. (D.I. 10 at ¶ 1; D.I. 14 at 2-3.) But in this instance, no such proof was provided. (Id.) Apparently, *271 the goods never arrived.[2]
According to Action,[3] it first learned that the shipment might not have arrived when it received a notice from Walgreen on January 19, 1987, requesting a signed proof of delivery because its warehouse had no record of receipt of the goods Overnite was to have delivered. (D.I. 10 at ¶ 10.) At some point after this, Action contacted Richard J. Quillen (of Overnite) by telephone and requested proof of delivery.[4] (D.I. 10 at ¶¶ 11-14.) Action then wrote to Overnite, requesting the signed proof of delivery, on three separate occasions: February 24, 1987, March 5, 1987, and April 28, 1987.[5] (D.I. 10 at ¶ 11; D.I. 14 at 3.)
Action states, and Overnite does not dispute, that "Action did not receive any written response to its requests for proofs of delivery." (D.I. 10 at 6.) According to Overnite, this was due to the fact that "[d]espite concerted efforts by Mr. Quillen, other personnel at the Elkton & Orlando terminals and by Overnite's home office in Richmond, the proof of delivery could not be located." (D.I. 14 at 3 [citation omitted].) Action does not contest this explanation but underscores that it relied[6] on Mr. Quillen's assurances that delivery had been made.[7] (See D.I. 10 at ¶¶ 13, 17b & 17c.) It also attaches significance to Overnite's own business records which, Action contends, reflect the fact that delivery had not *272 been made and that instead "portions of the shipment had been returned as undeliverable freight to the Overnite salvage warehouse in mid-November of 1986." (Id. at ¶ 17b.)
Action submitted its formal claim in writing, as required by section 2(b) of the bill of lading, on July 21, 1987. (D.I. 14 at 3; D.I. 10 at ¶ 15; see also Standard Form for Presentation of Loss and Damage Claim, Exhibit K, D.I. 10.) Overnite denied the claim on July 31, 1987, "on the ground that it was not filed within nine months after a reasonable time for delivery had elapsed." (D.I. 14 at 3; accord D.I. 10 at ¶ 16; see also Letter from Overnite Denying Action's Claim, Exhibit L, D.I. 10.)
Action brought suit to recover the value of its shipment on September 1, 1988. (D.I. 1.) On November 10, 1988, Overnite filed its answer, asserting that Action's claim against it is time-barred and containing a counterclaim for unpaid freight charges. (D.I. 4.)
Action argues, first, that its claim was timely and, secondly, that Mr. Quillen's misrepresentation (that the goods here in question had in fact been delivered to the Walgreen Company)[8] induced it to refrain from filing a written claim any earlier than it eventually did. (See D.I. 15 at 7.) Thus, Action contends that Overnite is estopped from asserting the alleged untimeliness of the claim as a defense to this action. (Id.) Overnite maintains the claim was not timely, and responds to Action's equitable arguments by challenging the validity of applying estoppel principles under the circumstances of this case. (See D.I. 14 at 11-12.)

II. CROSS-MOTIONS FOR SUMMARY JUDGMENT ON ACTION'S CLAIM
Both plaintiff and defendant contend there is no genuine issue of material fact, and hence move now for summary judgment. After considering the parties' written submissions and oral arguments,[9] the Court disposes of their motions for summary judgment as set forth below.
Summary judgment is appropriate only if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c). On a motion for summary judgment a trial judge is to perform "the threshold inquiry of determining whether there is the need for a trial  whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The fact that both parties seek summary judgment does not make it easier to obtain. See Newark Morning Ledger Co. v. United States, 539 F.2d 929, 932-33 (3d Cir. 1976); Home Insurance Co. v. Aetna Casualty and Surety Co., 528 F.2d 1388, 1390 (2d Cir.1976). It is well-settled that even though through cross-motions for summary judgment both parties have asserted that there are no contested issues of material fact, the Court's responsibility is still to determine independently whether disputed issues of material fact do exist. See Manetas v. Int'l Petroleum Carriers, Inc., 541 F.2d 408, 413 (3d Cir.1976); United States v. Arnold, 573 F.2d 605, 606 (9th Cir.1978).
The critical issue in this case is when the nine-month limitations period for filing claims began to run, for that will determine whether plaintiff's claim is time-barred. If Action's claim was in fact not filed in a timely fashion, the Court must then consider whether Action can assert estoppel to defeat Overnite's reliance on the nine-month limitations period.

A. Timeliness of Action's Claim

The goods at issue in this case were shipped under a uniform straight bill of lading that provides as follows:

*273 (b). As a condition precedent to recovery, claims must be filed in writing with the receiving or delivering carrier, or carrier on whose line the loss, damage, injury or delay occurred, within nine months of export traffic, within nine months after delivery at port of export) [sic] or, in case of failure to make delivery, then within nine months after a reasonable time for delivery has elapsed;....
(D.I. 14 at 5 [emphasis added]; see also Exhibit A, Plaintiff's Motion for Summary Judgment, D.I. 10.) Accordingly, in order to decide whether or not Action's claim is time-barred, the Court must first determine when section 2(b)'s period for reasonable delivery elapsed, thereby triggering commencement of the bill of lading's nine-month limitations period.
Chesapeake & Ohio Railway v. Martin, 283 U.S. 209, 51 S.Ct. 453, 75 L.Ed. 983 (1931), provides the starting point for our analysis. There, the United States Supreme Court stated that a reasonable period for delivery "means such time as is necessary conveniently to transport and make delivery of the shipment in the ordinary course of business, in the light of the circumstances and conditions surrounding the transaction." Id. at 213, 51 S.Ct. at 455 (citations omitted). The Chesapeake Court also stated that "[w]hat constitutes a reasonable time [for delivery] depends upon the circumstances of the particular case." Id. Since Chesapeake was decided, only three courts have directly addressed the specific question presented in this dispute, i.e. when the nine-month limitations period for filing claims with carriers begins to run.[10]See Intech, Inc. v. Consolidated Freightways, Inc., 836 F.2d 672 (1st Cir. 1987); John B. Sanfilippo & Son, Inc. v. Consolidated Rail Corp., 659 F.Supp. 990 (N.D.Ill.1987); A.M. Castle & Co. v. Yellow Freight System, Inc., No. 82 C 7304 (N.D. Ill. February 1, 1984) (LEXIS, Genfed library, Courts file).
In A.M. Castle & Co. v. Yellow Freight System, Inc., No. 82 C 7304, slip op. at 1, the plaintiff-shipper claimed that the reasonable period for delivery did not elapse until six months after the carrier received the goods. The defendant-carrier contended the claim was untimely and moved for summary judgment. The court denied the motion because it concluded it could not find as a matter of law that slightly over six months for delivery was not reasonable. Id.
Another district court case, John B. Sanfilippo & Son, Inc. v. Consolidated Rail Corp., 659 F.Supp. 990, also addresses our issue, although only indirectly. The Sanfilippo court focused mainly on determining whether, in the dispute before it, delivery had or had not been accomplished. See id. at 993. But after concluding delivery had not been effected, the court also made a finding that the reasonable period for delivery elapsed 42 days after the carrier received the goods for shipment. Id. at 996. This was the period apparently suggested by the parties. See id. at 993.
In the only other opinion that seems to deal with this issue, Intech, Inc. v. Consolidated Freightways, Inc., 836 F.2d at 677 n. 3, the Court of Appeals for the First Circuit held as a matter of law that more than three months was too long to be a reasonable time for delivery. In this case, the court found that no delivery had occurred because the parties had specifically agreed that "delivery" would also include unloading, which the carrier failed to do. Id. at 675. Accordingly, the court used the date on which the goods physically arrived at their destination, May 24th, as its reference point, and reasoned as follows:
It was clear [when the carrier's agent erroneously refused to unload the shipment on May 24th] that a dispute was in the making. Two or three days, a week, *274 perhaps even a month, may have been a commercially reasonable time to either settle the dispute and complete delivery or decide delivery was not going to occur. We need not count the days, however, because it is clear that more than three months is too long.
Id.
In sum, the scanty case law on this issue appears inconclusive. While the district court in A.M. Castle was unwilling to find as a matter of law that slightly over six months was not a reasonable time for delivery, the court of appeals in Intech found as a matter of law that more than three months was too long. And in Sanfilippo, the district court apparently accepted the parties' estimation that 42 days was reasonable.
Returning to the facts in the dispute currently pending, this Court specifically faces the following question: On what date after September 5, 1986  the date Overnite received the goods for shipment  did a reasonable period for delivery elapse? Action's claim was filed on July 21, 1987. Hence, it would be timely only if the reasonable period for delivery did not elapse before October 21, 1986 (which is nine calendar months before the date Action filed its claim).
According to Overnite, the reasonable period for delivery elapsed on September 18, 1986, the date delivery was scheduled to take place. (D.I. 14 at 2.) Overnite supports its contention with the following factual assertions:
Overnite's practice with Walgren [sic] was to telephone when it had a delivery to make and an appointment was scheduled for the delivery. In this case, the appointment was scheduled for September 18, 1986. On that date an Overnite trailer was "dropped" at Walgren's dock for Walgren to unload. On completion of the unloading, Walgren would notify Overnite which would then send a tractor to the Walgren dock to retrieve its trailer and pick up the bills of lading.
(D.I. 14 at 2 [citation omitted].) Overnite also states that it "would make as many as 100 shipments for Action in a month." (Id.) In support of its arguments, Overnite offers the deposition of Mr. Quillen, in which he describes Overnite's usual procedure for making deliveries to Walgreen as Overnite has argued in its brief. (See Dep. of Mr. Quillen at 46-47, D.I. 14.) Action responds by pointing out that Mr. Quillen's testimony is entirely derived from inadmissible hearsay. (D.I. 15 at 2, 5-6.)
According to Action, its shipment was scheduled to be delivered to Walgreen along with several other shipments. Therefore, Action contends the reasonable delivery period did not end until November 13, 1986, when the last part of the ten shipments with which Action's was allegedly grouped was delivered to Walgreen. (D.I. 10 at ¶ 17a.) Action reasons that "[a] reasonable time for delivery would certainly include the amount of time taken by the carrier to complete delivery to the same consignee of the group of shipments into which [Action's] shipment was commingled for transport and delivery." (D.I. 15 at 5.) In support of its argument that the reasonable period for delivery did not end until November 13, 1986, Action proffers Overnite's business records, which it procured through discovery. Action contends[11] that these records (see Exhibits C-G, D.I. 10) show that its shipment was part of a group of ten shipments that were all scheduled for delivery to Walgreen on September 18, 1986. (D.I. 10 at ¶ 3.) Action further contends that for unknown reasons, only one of the ten shipments was delivered to Walgreen on that date. (Id. at ¶¶ 4-5.) Five other shipments from this original group of ten were later delivered to Walgreen on varying dates through September and October, *275 with the last of these six shipments arriving on November 13, 1986. (Id.) Thus, four of these ten shipments bound for Walgreen, including Action's, purportedly never made it. According to Action's scenario, the bill of lading for its shipment was apparently lost, and the goods were mistakenly returned not to Action but to the manufacturer for credit. (See id. at ¶ 6 & pp. 5-6.)
There seems to be no disputed material fact that is relevant to resolution of the question of when the reasonable period for delivery elapsed. It is true that Mr. Quillen's deposition shows, on its face, that his "knowledge" regarding whether any appointment was made with Walgreen for delivery of the Action shipment on September 18, 1986, was derived from inadmissible hearsay. (See Dep. of Mr. Quillen at 46-47, D.I. 15.) On the other hand, one could reasonably conclude that Action implicitly conceded the fact that delivery was at the very least scheduled for this date. (See D.I. 10 at 1-2.) Moreover, Overnite has not controverted Action's interpretation of the shipping records before the Court. See supra note 11. Overnite and Action both simply urge this Court to adopt their respective dates as the date the reasonable period for delivery elapsed.
While the fact that one of the shipments scheduled for delivery on September 18, 1986 was delivered as late as November 13th is persuasive, the Court need not decide the issue on that basis alone. As mentioned earlier, Action's claim, filed July 21, 1987, would still be timely if the reasonable delivery period ended as early as October 21, 1986, over three weeks earlier than the date urged by Action. If this Court were to hold that Overnite, after receiving Action's shipment on September 5, 1986, could reasonably have taken until October 21, 1986 to deliver the shipment to Walgreen, then the reasonable delivery period would be 46 days. Such a result would not seem to contradict the few cases that address this issue. But, more importantly, a 46-day delivery period makes sense under the facts present here, and hence would comport with the Chesapeake Court's observation that what is a reasonable delivery period depends upon the circumstances. See 283 U.S. at 213, 51 S.Ct. at 455.
On behalf of its cross-motion for summary judgment, Overnite has presented no evidence, or made any argument, to support the proposition that, as a matter of law, 46 days  or the longer period urged by Action  was an unreasonable amount of time for delivery. Similarly, Overnite has not presented any evidence to show that the 13-day period it urges as the reasonable time for delivery was standard or typical for either trucking lines in general or Overnite's trucking service in particular.[12] That is, Overnite offers no evidence from which one can conclude that thirteen days is a reasonable delivery period. Apparently, Overnite erroneously assumes that the scheduled date of delivery is synonymous with what is a reasonable delivery date. If this were so, then it would be unreasonable to continue to expect delivery even one day after the scheduled date. Obviously, as Overnite's business records demonstrate, carriers do encounter delays, and goods do not always arrive on schedule. The only issue is the length of the delay that consignees or shippers can reasonably tolerate before suffering legal consequences for not realizing the expected goods have been lost or misdelivered.
Turning to Action's motion for summary judgment, the Court finds that Action's arguments and evidence are persuasive. Its goods were grouped with other shipments that were also scheduled for delivery to Walgreen on September 18, 1986. Walgreen received these shipments on various dates, from September 18th through October, and up until November 13th. Thus, the last shipment from this group was made almost two months after the scheduled *276 date. Moreover, Overnite's business records indicate that delivery of the Action shipment was possible, even if arguably not reasonably so, until mid-December of 1986, when portions of Action's shipment were finally forwarded to Overnite's salvage warehouse in Virginia for return to the manufacturers. (See Exhibit G, D.I. 10.)
In light of all of the evidence presented, and the undisputed facts, the Court finds that the reasonable period for delivery was at least 46 days long. That is, it did not lapse until October 21, 1986, at the earliest. Therefore, Action's claim, filed July 21, 1987, was within the nine-month limitations period and is not time-barred. Alternatively, the Court holds that even if Action's claim were found to be untimely, Overnite is estopped from invoking the nine-month limitations period as a bar to Action's suit. The rationale for this latter conclusion is set forth below.

B. Estoppel

Although "[t]he doctrine of estoppel has been applied sparingly to circumvene the terms of a bill of lading covering shipment in interstate commerce," Foster Wheeler Energy Corp. v. Daily Express, Inc., 485 F.Supp. 268, 272 (M.D.Pa.1980), the Third Circuit Court of Appeals has stated that estoppel principles should be applied in cases that arise under the Carmack Amendment, 49 U.S.C. § 11707, when application of such principles would further the statutory purpose. See Perini-North River Associates v. Chesapeake & O. Ry. Co., 562 F.2d 269, 273 (3d Cir.1977). In Perini, the Third Circuit held that the carriers were estopped from asserting the nine-month limitations period as a defense because their irregular conduct induced the plaintiff-consignee into believing it did not need to file a written claim. Id. at 274. Perini involved a claim for damaged, not lost, goods. Thus, the dispute did not center on when the nine-month period began to run, for that was clear (from the date of delivery of the damaged goods). Rather the dispute focused on whether the plaintiff-consignee's failure to file a formal, written claim should be excused because of the misleading conduct of the carriers. See id. at 271-72.
This Court finds that, under Perini, application of estoppel on behalf of Action is warranted. Action did submit a formal claim; but it did so in a purportedly untimely fashion because it relied on Overnite's repeated representation that delivery had been made and it would just be a matter of locating the proofs. (See, e.g., Dep. of Mr. Quillen at 29, D.I. 14 ["Q. ... But you can recall telling them that (the shipment) had been traced to the point where you were certain it had been delivered and it was just a question of getting the proof of delivery form? A. Yes, definitely."].) Overnite has not disputed that Action relied on its agent's misrepresentations regarding delivery having been accomplished, and this Court has already concluded that the misrepresentations, though perhaps innocent,[13] did occur. See supra note 8.
This Court further finds that Action has shown, and Overnite has not disputed, that reliance upon Mr. Quillen's misrepresentations that delivery was accomplished was reasonable. As Overnite stated itself, the shipment at issue here was only one of hundreds of shipments that Overnite had handled for Action. (See D.I. 14 at 2.) Given the fact that the parties had dealt with each other on numerous occasions in the past, it was reasonable for Action to believe Mr. Quillen's reassurances that delivery had been made and that it was just a matter of finding the proofs. Moreover, in the Quillen deposition pages proffered by Overnite itself, Mr. Quillen states that Action would occasionally need to request the proof of delivery for a particular shipment several times before finally receiving it. (See Dep. of Mr. Quillen at 41, D.I. 14 ["When you handled as many shipments *277 for Action as we did on an average month, there was always two or three [sic] stragglers as far as the proof of deliveries.... And you have to request them a second or even third time."].) Therefore, Action's reliance was reasonable even though Overnite repeatedly failed to satisfy Action's requests for the proofs. (See Exhibit I, D.I. 10.)
Finally, the Court finds that reliance on the inducement here was even more reasonable than in Perini. Here, the dispute centered on obtaining proof of a purportedly successful delivery merely in order to satisfy the consignee (Walgreen). In a sense, then, Action did not know it was involved in a dispute, and thus that it needed to file a claim, until Mr. Quillen finally  several months later  admitted no proof of delivery could be found. Action then came to the inescapable conclusion that despite the many assurances, delivery had in fact not been accomplished. By contrast, the Perini plaintiff was found to have been reasonably misled even though it knew from the day the goods were delivered that they were damaged by the carrier and, consequently, that a claim would have to be filed.
If Overnite, through its false assurances, had not lulled Action into believing delivery had been accomplished, Action would have filed a claim earlier. Accordingly, this Court alternatively holds that Overnite is estopped from asserting the nine-month limitations period against Action.

III. CALCULATION OF ACTION'S RECOVERY

A. Value of Goods and Freight Charges Paid

Action seeks recovery of $18,687.31, which represents the value of its shipment and the shipping charges it paid Overnite for delivery of these goods. (See D.I. 1 at ¶ 14.) In addition, Action seeks prejudgment interest and costs. (Id.) Because Overnite has not disputed that the goods here in question were worth $18,407.15 (see D.I. 4 at 5), and Action has presented invoices that support the claimed sum (see Exhibit H, D.I. 10), the Court accepts this figure as an accurate measure of the value of Action's shipment. The Court will also award Action $280.16 for the claimed freight charges because Overnite has admitted (compare D.I. 1 at ¶ 4 with D.I. 4 at ¶ 4) Action paid these. See Contempo Metal Furniture Co. v. East Texas Motor Freight Lines, Inc., 661 F.2d 761, 764 (9th Cir.1981).

B. Interest and Costs

Action also seeks recovery of prejudgment interest and costs.[14] As a general matter, it seems clear that this Court is empowered to award prejudgment interest in a suit such as this. See Co-operative Shippers, Inc. v. Atchison, Topeka and Santa Fe Ry. Co., 840 F.2d 447, 453-54 (7th Cir.1988); George R. Hall, Inc. v. Superior Trucking Co., Inc., 532 F.Supp. 985, 996-97 (N.D.Ga.1982). In fact, here the decision to award prejudgment interest is one ultimately committed to the Court's discretion. See Savarese v. Agriss, 883 F.2d 1194, 1201 (3d Cir.1989); Poleto v. Consolidated Rail Corp., 826 F.2d 1270, 1279 n. 16 (3d Cir.1987).
Action has presented evidence to show that Walgreen refused to pay for the goods never delivered by Overnite. (See Aff. of Mr. Jones at ¶ 5, Exhibit J, D.I. 10.) Thus, because of Overnite's failure to deliver, Action has been deprived of the use of the money Walgreen would have paid it had Overnite accomplished delivery, as well as of the money paid to Overnite as freight charges for the failed delivery. Accordingly, the Court finds that Action is entitled to prejudgment interest from November 14, 1986 to the present date  the time period advocated by Action and not contested by Overnite.[15]
*278 With respect to the proper standard for calculating the prejudgment interest due, Action urges that this Court use the legal rate of interest authorized by Delaware law. Because using the prevailing Delaware interest rate is an acceptable approach, see Gelof v. Papineau, 829 F.2d 452, 456 (3d Cir.1987); Slater v. Texaco, Inc., 506 F.Supp. 1099, 1116 (D.Del.1981); cf. George R. Hall, Inc., 532 F.Supp. at 998, and defendant Overnite has not objected, the Court will use the Delaware formulation. Delaware law provides that "[w]here there is no expressed contract rate [of interest], the legal rate of interest shall be 5% over the Federal Reserve discount rate including any surcharge as of the time from which interest is due...." Del.Code Ann. tit. 6, § 2301 (Supp.1988).
On November 14, 1986, the federal discount rate was 5.5%. One year later, the rate was 6%. In the third year, beginning on November 14, 1988, the discount rate was 6.5%.[16] The corresponding legal rates of interest in Delaware are, respectively, 10.5%, 11%, and 11.5%
Action stated at oral argument that it was seeking merely simple interest. Thus, for the first year the interest would be $1,962.16 ($18,687.31 shipment and freight charges × 10.5%). Interest during the second year would be $2,055.60 ($18,687.31 shipment and freight charges × 11%). Interest from November 14, 1988 to the present, October 23, 1989, would be $2,022.72 ($18,687.31 × 11.5% = $2,149.04 divided by 365 [days] = $5.88 per day × 344 days). Accordingly, the total prejudgment interest due from November 14, 1986 up to and including today's date, comes to $6,040.48.
The Court hereby orders Overnite to pay Action $18,687.31, for the value of its shipment and for reimbursement of the freight charges paid for that shipment, and $6,040.48 in prejudgment interest. Action is also entitled to suit costs. See Fed.R. Civ.P. 54(d).

IV. OVERNITE'S COUNTERCLAIM
Overnite states in its answer to Action's complaint that "Action Drug Company is justly and truly indebted to Overnite for unpaid freight charges in the amount of $5,304.34 which Action has wrongfully refused to pay." (D.I. 4 at ¶ 15.) Action denies this allegation and responds that this Court lacks subject matter jurisdiction over the counterclaim. (D.I. 5 at ¶ 15; D.I. 10 at 1.) At oral argument, Action also informed the Court that it had recently become involved in bankruptcy proceedings. (See Bankruptcy Court Order, dated August 14, 1989, Exhibit A, D.I. 18.)
Action filed for bankruptcy on August 1, 1989. (See D.I. 18 at ¶ 1.) Accordingly, pursuant to 11 U.S.C. § 362(a), the automatic stay provision of the federal bankruptcy code, Overnite's counterclaim against Action must be stayed.

FINAL JUDGMENT
For the reasons set forth in the Court's Memorandum Opinion entered in this action on this date, it is
ORDERED, ADJUDGED, and DECREED that:
1. The motion for summary judgment filed by plaintiff, Action Drug Company, is hereby granted as to Action's claim against defendant, Overnite Transportation Company.
2. Judgment is hereby entered in favor of Action against Overnite in the amount of $24,727.79 ($18,687.31 for lost property and freight charges, and $6,040.48 for prejudgment interest from November 14, 1986 to this date), postjudgment interest to be computed as provided in 28 U.S.C. § 1961, together with suit costs.
3. Overnite's counterclaim against Action is hereby stayed.
NOTES
[1] The Court has noted which facts are at all disputed.
[2] Although Overnite never expressly admits that it failed to make delivery, it never asserts to the contrary, and, in fact, in other ways it implicitly concedes that it never tendered the shipment to Walgreen. For example, in its answering brief filed in response to plaintiff's motion for summary judgment, Overnite describes its usual manner of making deliveries to Walgreen and states that the Action shipment at issue in this case was scheduled for delivery on a particular date. But it stops short of claiming that it followed the usual procedure and accomplished delivery of the shipment at issue. (See D.I. 14 at 2.)

Overnite's description in its answering brief of the deposition of its shipping representative, Richard J. Quillen, offers yet another example. There, Overnite states that Mr. Quillen was "wrong" in thinking delivery had been made. (See D.I. 14 at 10.) Lastly, and perhaps most persuasive of all, Overnite describes this case in its answering brief as "a matter on non-delivery, rather than a situation wherein delivery occurred in a damaged fashion...." (D.I. 14 at 8.)
Given all of the evidence presented on this issue, including Overnite's implicit concessions, a fact finder could not reasonably find that the goods were delivered to Walgreen. Thus, the Court will assume they were not.
[3] Overnite neither admits nor denies this allegation. (D.I. 4 at ¶ 6.)
[4] Although initially Overnite neither admitted nor denied Action's allegations regarding conversations with Mr. Quillen (see D.I. 4 at ¶ 7), the very pages of Mr. Quillen's deposition that Overnite attached to its answering brief show that several conversations with Action did take place. (See D.I. 14 at 20.) Moreover, one of the Quillen deposition pages proffered by Overnite specifically indicates  without explanation or disavowal by Overnite  that the initial conversation between the parties (regarding the shipment at issue in this case) may have occurred when Action claims it did, i.e. January of 1987. (Compare Deposition of Richard J. Quillen ["Dep. of Mr. Quillen"] at 29, in Overnite's answering brief, D.I. 14 [Mr. Quillen stating that he recalled speaking with Action in "maybe January of '87 or something like this," at which point he advised Action delivery had been made and the proof would be forthcoming] with Plaintiff's Motion for Summary Judgment, D.I. 10 at ¶¶ 10-12 [stating that Action "immediately" spoke with Mr. Quillen after receiving, on January 19, 1987, Walgreen's notice of no record of receipt of the goods].)
[5] Neither party has argued that any of these three letters to Overnite might constitute a sufficient written notice of claim so as to excuse the filing of the "formal" claim at the later, perhaps untimely, date. Thus, while we note in passing, in view of the content of these letters, that such a claim would seem to have no merit under the applicable case law, we need not actually decide this issue.
[6] The issue of reliance seems to be in dispute only with respect to Action's contention that it relied on Mr. Quillen's remarks allegedly requesting it not to file a claim. See infra note 7.
[7] Action also argues that Mr. Quillen specifically asked it to refrain from filing a formal, written claim "unless and until the proofs of delivery were not located." (D.I. 10 at ¶ 17c; see also Affidavit of Lawrence Jones [Action's Operation Manager; hereinafter "Aff. of Mr. Jones"], D.I. 10, Exhibit J at ¶ 4.) However, because Overnite disputes that this particular misrepresentation occurred (see D.I. 14 at 10), and the evidence presented on this issue could reasonably be viewed as inconclusive (see Dep. of Mr. Quillen at 28-29, D.I. 14; Aff. of Mr. Jones, D.I. 10, Exhibit J at ¶ 4), for purposes of the parties' summary judgment motions the Court will not give any weight to this allegation.
[8] Overnite has implicitly conceded that Mr. Quillen made this misrepresentation, albeit perhaps innocently. (See D.I. 14 at 10 ["Mr. Quillen thought that delivery was made. He continues to think so. He was wrong."].) What Overnite seems to dispute is that Mr. Quillen made any misrepresentation relating directly to whether or not Action should delay in filing a formal, written claim. (See id. at 13.) As mentioned above, see supra note 7, the Court will not give any weight to allegations of the latter, alleged misrepresentation.
[9] Oral argument was heard on October 11, 1989.
[10] Of course, on this issue the Court considers only those cases involving a failure to make delivery for in those cases in which delivery is made, section 2(b) of the bill of lading clearly provides that the nine-month limitations period begins to run on the date of delivery. The Court would also note that both parties have framed all of their arguments around that portion of section 2(b) that deals with the limitations period for cases involving a failure to make delivery.
[11] Overnite has not disputed or denied that these are true and correct copies of its business records. Overnite has also never argued that Action's conclusions regarding the meaning of these records are incorrect. In fact, Overnite does not even address Action's interpretation of these records in the half-page it devotes to the reasonable delivery period issue in its answering brief. (See D.I. 14 at 8.) Moreover, at oral argument, it confined its comments regarding Action's interpretation of its business records to an observation that Action could support its view of what occurred only by drawing inferences from the shipping records in question.
[12] Given the fact that Overnite emphasized, in its brief and in oral argument, the longstanding nature of its relationship with Action (see D.I. 14 at 2), it would seem that Overnite could certainly have mustered up evidence to show that the 13-day delivery period now urged was fairly typical, or at least not unheard of, between the parties (or, perhaps, with certain types of loads).
[13] In Perini, 562 F.2d at 274, the Third Circuit observed that even if the carrier did not intend to mislead the plaintiff, equity would still militate against penalizing the plaintiff for the carrier's actions. Thus, it is not particularly significant that the repeated misrepresentations in this case were innocently made.
[14] The Court notes that Overnite chose not to address this issue in its brief and oral argument. Thus, the Court has not been offered any challenge to, or alternate formulation of, Action's claims for these sums.
[15] The record of course also provides ample support for use of this time period. (See generally Exhibits B, F & H, D.I. 10 [receipt of freight charges paid to Overnite, and invoices not paid by Walgreen].)
[16] The Court will use all of these figures in order to account for fluctuations in the discount rate in making the prejudgment interest calculations. See Gelof, 829 F.2d at 456.