**FOSTER WHEELER ENERGY
CORPORATION, Plaintiff,**

**v.**

**DAILY EXPRESS, INC., Defendant.**

**Civ. A. No. 78–941.**

United States District Court,
M. D. Pennsylvania.

Jan. 23, 1980.

Joseph P. Hafer, Thomas & Thomas, Harrisburg, Pa., for plaintiff.

Clyde W. McIntyre, Harrisburg, Pa., for defendant.

## MEMORANDUM

RAMBO, District Judge.

This lawsuit was initiated on September 21, 1978 by the filing of a complaint in which Foster Wheeler Energy Corporation (Foster) claims for the value of a 45-ton hydraulic crane which it owned. The crane was delivered to Daily Express, Inc. by Foster at Catlettsburg, Kentucky, for transportation to Orange, Texas. On September 14, 1976, it was damaged in transit and had to be sold for salvage value. Responsibility for the damage remains a matter of dispute.

Daily Express has filed a motion for summary judgment. The basis of the motion is Daily Express' belief that Foster may not recover any loss attributable to the crane accident because Foster failed to file a written claim with the carrier within nine months of the loss as required by the bill of lading.

Foster recognizes the requirement of the writing, and admits that it filed no timely written claim, but argues that recovery is not absolutely precluded by the failure for these reasons:

1. Three letters, none of which were written by Foster, should be deemed a written claim, thereby satisfying the written claim requirement.

2. Defendant by its word and conduct is estopped from raising the requirement that a written claim be filed within nine months of the loss.

3. The parties made an oral contract to settle plaintiff's claim.

When considering a motion for summary judgment, the court must accept as true the statements of the party opposing the motion. It then extracts from these statements all inferences favorable to that party. If the court, reviewing the evidence in this manner, is convinced that no genuine dispute exists as to a material fact, and that the moving party is entitled to judgment as a matter of law, then it should grant the motion. *Scott v. Plante*, 532 F.2d 939 (3rd Cir. 1976). In applying this standard the court will consider the affidavits and depositions of the parties.

It is undisputed that Foster did not file a written claim for the damage to its crane during the requisite time period. The parties agree that the bill of lading is the contract covering the shipment of the crane, and that it contains the following language:

§ 2(b) As a condition precedent to recovery, claims must be filed in writing with the receiving or delivering carrier . . . within nine months after delivery of the property . . . or in case of failure to make delivery, then within nine months after a reasonable time for delivery has elapsed; and suit shall be instituted against any carrier only within two years and one day from the day when notice in writing was given by the carrier to the claimant that the carrier has disallowed the claim for any part or parts thereof specified in the notice. Where claims are not filed or suits are not instituted thereon in accordance with the foregoing provisions, no carrier hereunder shall be liable, and such claims will not be paid.

It is clear that the parties had prompt notice of the loss, that both sides investigated the damage and its cause, and that they were able to agree upon the salvage value of the crane. At deposition George Kertis, manager of Foster's construction services department, stated that his company was involved with the shipment of equipment through many common carriers. Foster's standard company procedure was to have claims for damaged equipment handled by the traffic and insurance departments. Kertis testified that he sent a memo to

Foster's insurance department, a few days after the crane incident, informing the department of the damage and enclosing a copy of the bill of lading. He also stated that he did not know when Foster usually filed a formal written claim because he does not get involved in that area. Speaking of his contact with Kenneth Cummings of Daily Express' insurance department, Kertis said, "I normally always told him it's [the matter of a claim for the crane] in the hands of our insurance department. We [Kertis' department] were solely concerned about how the machine was damaged, what was wrong, can we salvage it, can we do anything to it. That was always my input." Further along in the deposition the testimony developed as follows:

Q. (By counsel for defendant) He [Cummings] asked you when something, the bill or the claim or what have you, was going to be submitted to the company?

A. (Kertis) Right. I said our insurance department—you know, the paperwork is probably going through and you will hear from our insurance department.

The conversation related above was the last between Cummings and Kertis. There was general concurrence that it took place in February 1977, well within the nine month period in which a written claim had to be filed by Foster. Later Kertis stated (Kertis deposition, page 28) that responsibility for the *settlement* of claims rested with Foster's insurance department.

Plaintiff argues in opposition to defendant's motion for summary judgment that there are conflicting factual contentions and different ultimate inferences to be drawn from the facts, and their existence precludes the granting of the motion. Though the testimony of the two men who conducted business between Foster and Daily Express, George Kertis and Kenneth Cummings, is not in total accord, the court finds no differences in the facts which are material to a ruling on the law governing this action. Defendant's motion for summary judgment will be granted for the reasons that follow.

THE LETTERS AS CLAIMS

Certainly there is no dispute of material fact concerning the three letters which plaintiff believes should be deemed a written claim.[1] The parties agree that the letters are business correspondence related to the salvage value of the damaged crane. There has been no allegation that they have been changed or falsified. It is a question of law whether or not they should be deemed a claim within the meaning of the written claim requirement on the bill of lading.

In support of its position that the letters should be deemed a written claim, plaintiff argues that the courts have been liberal in their interpretation of the writing requirement. It is accurate to say that, when a *consignee* has sent a written document *to the carrier* indicating an intent to seek payment from the carrier and identifying the shipment in question, the courts have been generous in their construction of these documents as claims. *Georgia, Florida and Alabama Ry. Co. v. Blish Milling Co.*, 241 U.S. 190, 36 S.Ct. 541, 60 L.Ed. 948 (1916). Yet, plaintiff points to only one case, *Loveless v. Universal Carloading and Distributing Co.*, 225 F.2d 637 (10th Cir. 1955), in which a writing *from the carrier to the consignee* was ruled a written claim.

The facts and the letter in *Loveless* were substantially different than those of the present case. The letter from the carrier created an inequitable situation which the

---

1. Of the letters the most significant is correspondence from Kenneth Cummings, director of Daily Express' insurance department, to George Kertis, manager of Foster's construction services department. The text of that letter states: Dear George: As discussed, we feel that the offer by Gallardi Hoist and Crane, Ltd., of $25,000 for the salvage on the above mentioned damaged crane is fair and reasonable.

You have our consent to sell the salvage for this amount with the understanding this salvage recovery will be applied as a credit to any settlement agreed to by Daily Express, Inc., and Foster Wheeler Corp. on this loss.

We have also requested our excess insurer to write you accordingly. Sincerely, Daily Express, Inc., K. F. Cummings.

court was striving to avoid. Some machinery had been damaged in transit. The extent of the damage was not immediately ascertainable, but the carrier was satisfied that it was liable for the damage. The carrier wrote to the consignee, acknowledging liability for the loss, concurring in the conclusion that it would be sometime before the exact damages could be determined, and stating: "This will protect you in the event claim will be filed, for a period of up to two years." Later the carrier raised the consignee's failure to file a written claim within nine months, a requirement in the bill of lading, as a bar to any recovery. The court in *Loveless* did not use the doctrine of estoppel to bypass the terms of the bill of lading. Instead it deemed the carrier's letter a written claim.

The court's discussion of the "written claim" issue is instructive:

> Such writing is nonetheless a claim "in writing" within the purposes of § 2(b) simply because it takes the form of an acknowledgment of the damages and the cause thereof in the hand of him who is to be held liable when the extent thereof is determined. Certainly it is no perversion of public policy to denominate the carrier's acknowledgment of damages and liability a claim "in writing" to be formalized when the extent of damages is determinable. To so construe the writing leaves no doors open for abuses and discriminations which the stipulation in § 2(b) was intended to prevent. And we therefore hold the written acknowledgment of damages to be a claim in writing within the meaning and purposes of § 2(b) of the bill of lading. *Loveless*, 641.

■ The letters that plaintiff would have the court construe as a claim do not acknowledge liability for the loss. They in no way indicate that there is any intent on the part of the carrier to extend the period of time in which a formal written claim must be filed. Nor do they confirm that there might be a practical difficulty in determining the damage figure.

*Loveless* is an aberration based on its peculiar facts. The Court of Appeals in that case was correct in reasoning that public policy would not be undermined by its holding, and it emphasized the content of the writing which it construed as a claim. If the holding in *Loveless* were taken out of context, and applied to the three letters that plaintiff would have this court designate a claim, the public policy behind the requirement of having the consignee file a written claim within a period of nine months would be seriously eroded.[2]

The Interstate Commerce Commission has issued a regulation that specifies the minimum contents of a written claim. The regulation states:

(b) Minimum Filing Requirements. A communication in writing from a claimant, filed with a proper carrier within the time limits specified in the bill of lading or contract of carriage or transportation, and (1) containing facts sufficient to identify the baggage or shipment (or shipments) of property involved, (2) asserting liability for alleged loss, damage, injury, or delay, and (3) making claim for the payment of a specified or determinable amount of money, shall be considered as sufficient compliance with the provisions for filing claims embraced in the bill of lading or other contract of carriage.

(c) Documents not Constituting Claims. Bad order reports, appraisal reports of damage, notations of shortage or damage, or both, on freight bills, delivery receipts, or other documents, or inspection reports issued by carriers or their inspection agencies, whether

**2.** The case law has recognized that the primary purpose of the written claim requirement has been to prevent discrimination by carriers. *New York v. United States,* 331 U.S. 284, 67 S.Ct. 1207, 91 L.Ed. 1492 (1947); *Perini-North River Assoc. v. Chesapeake and Ohio Ry. Co.,* 562 F.2d 269, 273 (3rd Cir. 1977). Not only does the bill of lading recite that the written claim is a prerequisite to recovery from the carrier; but the defendant's tariff, filed with the Interstate Commerce Commission (ICC), contains the same provision; and the timely written claim is mandated by ICC regulations. 49 C.F.R. § 1005.2 (1976).

the extent of loss or damages is indicated in dollars and cents or otherwise, shall, standing alone, not be considered by carriers as sufficient to comply with the minimum claim filing requirements specified in paragraph (b) of this section. 49 C.F.R. § 1005.2 (1976).

Of the three minimum filing requirements, the letter from Daily Express to Foster meets only number one. Section 1005.2(c) indicates that the ICC did not intend that the documents prepared by carriers in the ordinary course of business be used to satisfy the essential of a written claim.

There is nothing exceptional about the three letters at issue in the present case. They represent mundane business correspondence which might transpire following any incident of freight damage. To find that they satisfy the written claim requirement would emasculate that contract provision, open the door to the rate discrimination abuses which the courts have vigilantly sought to preclude, and invite endless litigation over what documents prepared by the carrier might be deemed a claim. The court declines to take that path. The letters presented by plaintiff do not satisfy the requirement contained in the bill of lading that a timely written claim be filed with the carrier.

ESTOPPEL

The doctrine of estoppel has been applied sparingly to circumvent the terms of a bill of lading covering shipment in interstate commerce. See historical discussion in *Perini-North River Assoc. v. Chesapeake and Ohio Ry. Co.*, 562 F.2d 269 (3rd Cir. 1977). When it has been invoked, there has been evidence that some communication from the carrier to the shipper induced the nonfiling, misfiling, or untimely filing of the written claim. Thus, in *Lehigh Valley Railroad v. State of Russia*, 21 F.2d 396 (2d Cir.), *cert. denied*, 275 U.S. 571, 48 S.Ct. 159, 72 L.Ed. 432 (1927), the carrier was not permitted to raise a defense based on misfiling because the evidence showed that a railroad agent had erroneously instructed the claimant where the claim should be sent. In *Perini,*

*supra,* the carrier's agent informed the shipper that a claim need not be prepared because one had already been filed.

■ In order for estoppel to apply, the fact finder must determine not only that there was some representation from the carrier concerning the filing of a claim, but also that the shipper relied upon the representation thereby failing to file a timely written claim. The record before the court is devoid of controversy as to material facts on the estoppel issue. Kertis does not assert that he was told it was unnecessary to follow the standard claim procedure. On the contrary, he acknowledges that, after several months had elapsed and no claim had been filed, Cummings phoned to inquire when the paper work would be submitted.

Plaintiff argues "the question of whether defendant's agent, by his words or conduct, induced Plaintiff's agents not to file a claim in writing within a nine month period, is a question of fact for the jury." The court would agree with this proposition if there were disputed material facts as to the course of dealing between the agents, or if there were some evidence in the deposition that there was *any* indication on the part of Daily Express that no written claim was required. Then it would be the duty of the jury to decide if the representations were made and whether or not they induced Foster's failure to file a timely written claim.

■ It may be that Cummings' actions, and the amicable relationship between the two men, led Kertis to believe that the claim would be settled. But that is not material. Kertis' belief would be material to the estoppel issue only if Kertis was led to believe that the claim would be settled even if plaintiff failed to comply with the claim procedure described in the contract between the parties. There is absolutely no testimony that Cummings waived this prerequisite for the initiation of the settlement procedure, nor can this reasonably be inferred. Thus, there is no disputed factual issue to be decided before application of the law. Furthermore, even if Kertis held the belief that the written claim requirement had been waived, there are no facts to

support an inference that his belief induced inaction on the part of the Foster insurance department. That department was charged with the responsibility of filing and settlement of claims. Without the key elements of inducement and reliance thereon, Foster's estoppel theory fails.

CONTRACT TO SETTLE

Plaintiff's third argument is that the written claim prerequisite can be disregarded because the parties reached a binding oral agreement to settle the claim. Defendant responds that it is questionable whether an oral contract to settle an unfiled claim is lawful, when one of the parties would be acting in violation of ICC regulations. The court will not reach this legal issue because it finds that the testimony of Foster's agent forecloses the possibility that a contract existed.

Plaintiff's case on the contract claim rests on the testimony of George Kertis. He was the sole individual from Foster who was in contact with Daily Express on a regular basis in connection with the crane incident.[3] There are no material facts in dispute as to the course of dealing between Kertis and Cummings. Kertis relates substantially the same *facts* as Cummings. What differs is Kertis' subjective impression of what their course of dealing meant. Kertis says he was "under the impression" that the claim would be settled; that "he [Cummings] never objected that I can recollect that the $130,000.00 was an unacceptable figure;" and, "I assumed they were going to pay the $130,000.00 less the salvage." The tenuous nature of the contract theory is illustrated by the following exchange:

Q. [Attorney for defendant]

All right. There was good will, and you discussed procedures for determining the amount of the claim. You discussed the fact that an effort would be made to settle the claim.

But I still get back to the basic point did Mr. Cummings ever come right out and say we will pay the X dollars? Did he ever use those words?

A. [Kertis]

I can't remember any words that were actually used. I'm saying I just had the impression because I'm sure if I didn't have that impression we would have documented a lot more of our conversations. And I would have confirmed everything we discussed.

Q. At this time you don't recall the specific words Mr. Cummings used?

A. No.

Q. All you really recall is you had discussions about how to determine the amount of the claim and you had discussions about trying to settle the claim and you had discussions about when is the bill or whatever the word used going to be submitted to the company.

That is basically the way the discussions went?

A. And also the sale of the machine to that outfit out of Canada.

In another portion of the deposition Kertis admitted that his role in the claims procedure was a limited one, and that the ultimate responsibility for any settlement lay with Foster's insurance department. When asked if he ever questioned Mr. Cummings as to how he would go about handling the claim, Kertis replied in the negative. Defendant's attorneys then questioned, "you simply turned the matter over to the insurance department for handling?" Kertis replied, "That's right."

■ The Kertis deposition is replete with passages which demonstrate both his lack of authority and his lack of intent to enter into a contract to settle the claim. Without these elements, there could be no contract formation. Kertis' assumptions and impressions are irrelevant when measured against the fact that, though pressed to state specifics at numerous points during the deposition, he could not flesh out the contract theory with evidence.

---

3. One other Foster employee, Nolan Weber, did inspect the damage to the crane. He testified at deposition that he was not in any way involved in the "circumstances surrounding the handling of the claim." Weber deposition, p. 44.

The court finds no legal basis for plaintiff's contention that the express terms of the bill of lading should be disregarded. As it is undisputed that plaintiff failed to file a timely written claim, defendant is entitled to summary judgment.