**USINOR STEEL CORPORATION,
Plaintiff,**

v.

**NORFOLK SOUTHERN
CORPORATION, et
al., Defendants.**

Civ. No. 02 CV 4277(SSB).

United States District Court,
D. New Jersey.

March 15, 2004.

Samuel C. Coluzzi, Nicoletti, Hornig, Campise & Sweeney, Hackensack, NJ, for Plaintiff.

Kenneth J. Grunfeld, Janssen & Keenan, P.C., Philadelphia, PA, for Defendants.

## OPINION REGARDING MOTIONS FOR SUMMARY JUDGMENT

BROTMAN, District Judge.

Plaintiff, Usinor Steel Corp., brings this action against Defendant Norfolk Southern Corp. under the Carmack Amendment, 49 U.S.C. § 14706 et seq, to recover money damages for the transit-related loss of three steel coils. Plaintiff alleges breach of contract (Count I); negligence (Count II); gross negligence (Count III); breach

of bailment (Count IV); and conversion (Count V). Both parties move for summary judgment. The issue presently before this Court is whether Plaintiff's failure to submit a claim for loss within the nine-month period prescribed by the conditions of carriage is excused by Defendant's failure to notify Plaintiff that the portion of the shipment in question was rejected as damaged by the consignee. For the reasons stated below, the Court will deny Plaintiff's motion for summary judgment and will grant Defendant's motion for summary judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Usinor Steel Corp. (hereafter "Usinor" or "Plaintiff") is in the business of purchasing and selling steel products throughout the United States and overseas. (Complaint at ¶ 5). Defendant Norfolk Southern Railway Company (hereafter "Norfolk" or "Defendant") transports goods for hire. (Complaint at ¶ 9; Def's Answer to Compl. at ¶ 9). On January 26, 2000, Usinor sold seven steel coils for a total of $95,402.56 to Feralloy Corporation (hereafter "Feralloy" or "consignee"), a company that processes steel for use in various mechanical parts. (Def.'s Statement of Mat. Facts, Deposition of Frederick Stanton at 9 at Exh. A). On May 17, 2000 Usinor entered into an agreement with Norfolk for transportation of the seven steel coils by rail from Camden New Jersey to a port in Portage, Indiana for delivery to Feralloy. (Def.'s Opp. to Pl.'s Mot. for Summ. Judgment, Freight Bill at Exhibit A). Norfolk generated a rate quote incorporating the "Conditions of Carriage," which the parties agree governs the shipping agreement at issue in this case. (Def.'s Statement of Mat. Facts at ¶ 18; Pl.'s Resp. to Def.'s Statement of Mat. Facts at ¶ 18). Rule 150 of the Conditions of Carriage states that the agreement adopts the terms of the Uniform Bill of Lading as contained in the Uniform Freight Classification 6000–L. The language contained within the Uniform Bill of Lading as referenced in Rule 150 is identical to the language set forth in 49 C.F.R. Sec. 1035 [1], the federal regulations governing uniform straight bills of lading. (Def.'s Statement of Mat. Facts at ¶ 19; Pl.'s Resp. to Def.'s Statement of Mat. Facts at ¶ 19). The Uniform Freight Classification 6000–L states in pertinent part:

> Sec. 2(b) As a condition precedent to recovery, claims must be filed in writing with the receiving or delivering carrier, or carrier issuing the bill of lading, or carrier on whose line the loss, damage, injury or delay occurred within nine months after delivery of the property ... or in case of failure to make delivery, then *within nine months after a reasonable time for delivery has elapsed;* and suits shall be instituted against any carrier only within two years and one day from the day when notice in writing is given by the carrier to the claimant that the carrier has disallowed the claim or any part or parts thereof specified in the notice.

> \*  \*  \*  \*  \*  \*

> Sec. 4(b) Where non-perishable property which has been transported to destination hereunder is refused by consignee or the party entitled to receive it, or

---

**1.** Pursuant to 49 C.F.R. Sec. 1035.1(a) of the regulations governing bills of lading, "All common carriers ... engaged in the transportation of property other than livestock and wild animals, by rail or by water subject to the Interstate Commerce Act are required to use straight bills of lading as prescribed in Appendix A and B to this part." In keeping with the regulation, the language contained within the conditions of carriage which controls the parties' agreement in the present matter is identical to the language contained within sections 2(b) and 4(b) of Appendix B of the regulations.

said consignee or party entitled to receive it fails to receive it within 15 days after notice of arrival shall have been duly sent or given, the carrier may sell the same at public auction to the highest bidder, at such place as may be designated by the carrier. *Provided, That the carrier shall first have been mailed, sent, or given to the consignor notice that the property has been refused or remains unclaimed,* as the case may be, and that it will be subject to sale under the terms of the bill of lading if disposition be not arranged for, and shall have published notice containing a description of the property, the name of the party to whom consigned, or, if shipped order notify, the name of the property to be notified, and the time and place of the sale, once a week for two successive weeks, in a newspaper of general circulation at the place of sale or nearest place where such newspaper is published: Provided, That 30 days shall have elapsed before publication of notice of sale after said notice that the property

was refused or remains unclaimed was mailed, sent or given.

(Def.'s Statement of Mat. Facts, Uniform Classifications at Exhibit D) (emphasis added).

Norfolk delivered all seven steel coils on May 22, 2000, however, a receiver at Feralloy refused to accept delivery of three of the coils, noting on a receiving report that the coils were "telescoped." [2] (Def.'s Statement of Mat. Facts, Dep. of Frederick Stanton at Exh. A).[3] Feralloy did not notify Usinor that they rejected the coils.[4] On June 28, 2000, Feralloy issued Usinor a check in the amount of $54,511.16, representing payment for the four coils that were accepted. (See Def.'s Mot. for S.J., Feralloy accounting detail at Exh. A).

On May 23, 2000, Feralloy released the rail car containing the rejected coils to Norfolk Southern Railroad. (Def.'s Mot. for. S.J., Railcar Release Form at Exh. A). Sometime in June, Norfolk conducted a salvage sale, and sold the coils to L & H Metals. (Pl.'s Complaint at ¶17). L & H Metals ultimately sold the coils to Active

**2.** The term "telescoped" refers to a condition in which a band on a steel coil that keeps the coil tightly wound comes loose and causes the coil to oscillate. Because the coils are made of high strength steel and are wound tightly like a clock-spring, "oscillation" presents the danger of the coil unwinding with tremendous force and potentially injuring whomever unloads the rail car. (Dep. of Frederick Stanton at Page 47–48).

**3.** The ocean bill of lading, which predates the shipping transaction between Usinor and Norfolk indicates that the coils were damaged prior to Usinor's shipment to Feralloy. That bill of lading states that the coils were "Partly rust stained, wet before shipment, winding staggered, telescoped, up to five minor indents and/or chaffing marks on winding edges." (Def.'s Opp. to Pl.'s Motion for S.J. at Exh. A. Ocean Bill of Lading).

**4.** Feralloy's procedure in place at the time of the shipment in question for rejecting a shipment called for the receiving clerk to indicate

on the bill of lading that the material was rejected upon arrival. (Def.'s Mot. for S.J. at Feralloy Exh. 15). Thereafter, according to the prescribed procedure, the document was to be sent to the inventory department for data processing. Id. A shipper would then be notified through the payment process that goods were not accepted either when the invoice was not paid at all or was paid short. Feralloy also had a policy of notifying the delivering rail company that the delivery had been rejected. Once the railroad was notified, it would then retrieve the car and deliver it either to the point of origin or another destination if the parties made such an arrangement. (Id.) Since the parties admit that Usinor was not notified, and the accounting department was not aware of the rejection, it appears this procedure was not followed. (See Def.'s Mot. for S.J., Feralloy e-mail dated December 18, 2002, at Exh. A).

Metals. Norfolk recovered $11,365.34 in salvage proceeds, but did not notify Usinor of Feralloy's rejection or the salvage sale.[5] (Pl.'s Complaint at ¶ 19–22).

Usinor, apparently unaware that Feralloy rejected the coils, or that Norfolk sold them at salvage, continued to seek payment from Feralloy for the balance of the original invoice in the amount of $40,891.49. Usinor made the following attempts at payment: (1) on August 24, 2000, Usinor sent Feralloy a copy of the original invoice requesting payment; (2) sometime after Feralloy made the $54,511.16 payment, Usinor Account Manager, Robert Zullo, spoke to an accounting clerk at Feralloy to inquire about the short payment. The accounting clerk explained to Zullo that according to her records the coils had not been received into inventory and that payment could not issue for the outstanding coils. The clerk was not aware at that time that someone in the receiving department rejected them; (3) on October 5, 2001, Usinor sent Feralloy an accounting memorandum detailing a number of past due balances, including an item for the coils which are the subject of this case. (Def.'s Mot. for S.J., Usinor Memo at Exh. A). Referring to the balance due for the coils, item F of that memo states:

"A partial payment was made against this invoice with no explanation for the short payment. In any event, I have attached the packing list, mill cert and ocean bill of lading showing proof of the total quantity delivered and invoiced.

All of the material was delivered, so we don't understand why the invoice was short paid."

(Id.).

Usinor's inquiry regarding the balance due on the coils prompted an investigation of the entire shipping and payment history by Feralloy General Manager Frederick Stanton. (Def.'s Statement of Mat. Facts, Deposition of Frederick Stanton, Page 31 at Exh. A). That investigation revealed that the coils were delivered but were not accepted by the receiving department at Feralloy. (Id. at 32). Prior to Stanton's investigation, neither Feralloy's accounting or inventory departments were concerned by what they perceived as a shortage in the shipment. Apparently Feralloy's computer inventory and accounting program did not then (and still does not) distinguish between shipments which have not yet arrived and shipments which have arrived but have been rejected. (Id. at 87–88, 110). According to Stanton, the fact that only four of the seven coils ordered had been placed into inventory was not a cause for concern because it was not uncommon to receive cargo in multiple shipments.

On March 22, 2002, Usinor filed a claim with Norfolk seeking payment for the three rejected coils in the amount of $40,891.49, the difference between the original invoice amount of $96,402.65 and the amount paid for the coils that Feralloy accepted. (Pl.'s Resp. to Def.'s Statement of Mat. Facts at ¶ 13, 22). Norfolk rejected Usinor's claim on May 16, 2002, stating:

---

5. According to Clifford Creech, a manager for Norfolk in charge of prevention and field services, procedure requires notifying the consignee to determine why the cargo was not unloaded. If the consignee indicated that the cargo was rejected, Norfolk would have "notified the shipper and asked the shipper for disposition." (See Affidavit of David Y. Loh, Deposition of Clifford Creech ¶ 12–19 at Exh. G). Creech claims that Norfolk did not follow this procedure because the Norfolk employee responsible for handling could not locate the records identifying the consignee and the shipper, which in this case amounts to the waybill. (Id at ¶ 23–25). However, Creech states in his deposition that the freight bill of lading, which identifies Usinor as the shipper and Feralloy as the consignee, was available. (Affidavit of David Loh at Exh. G, Deposition of Clifford Creech, ¶ 24–25)

Section 2(b) of the [bill of lading contract which governs freight loss and damage settlements] provides that freight loss and damage claims must be filed in writing with either the origin or destination carrier within nine months from the date of delivery.

Rail carriers cannot waive the provisions of the bill of lading contract as it has been held that they have the effect of law.

Our records confirm that the shipment, subject of your claim, was delivered to the intended billed consignee on May 22, 2000. Your claim was received in this office on March 25, 2002, which exceeds the nine month filing requirement.

\* \* \* \* \* \*

The cargo, subject of your claim was rejected by the consignee. It was disposed of for the best possible proceeds of $11,365.34 which will be remitted to you under separate cover.

(Pl.'s Complaint, Norfolk Claim Denial Letter).

Plaintiff filed a complaint on June 6, 2002, seeking damages in the amount of $40,891.49 for the three salvaged coils. Thereafter, the parties cross-moved for summary judgment. Sometime in the interim, Norfolk conducted research on the salvage proceeds and after tracing them back to the Usinor shipment, forwarded Usinor a check in the amount of $11,365.34.[6] (Declaration of George Bradford at ¶ 27). The total amount remaining in dispute is $29,526.15. (Id at ¶ 28).

## II. LEGAL STANDARD GOVERNING A MOTION FOR SUMMARY JUDGMENT

The standard for granting a motion for summary judgment is a stringent one, but it is not insurmountable. Fed.R.Civ.P. 56 provides that summary judgment may be granted only when materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Serbin v. Bora Corp.*, 96 F.3d 66, 69 n. 2 (3d Cir.1996). In deciding whether there is a disputed issue of material fact, the court must grant all reasonable inferences from the evidence to the non-moving party. The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Supreme Court decisions mandate that a summary judgment motion must be granted unless the party opposing the motion "provides evidence 'such that a reasonable jury could return a verdict for the nonmoving party.'" *Lawrence v. National Westminster Bank New Jersey*, 98 F.3d 61, 65 (3d Cir.1996) (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505). Once the moving party has carried its burden of establishing the absence of a genuine issue of material fact, "its opponent must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The non-moving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Serbin*, 96 F.3d at 69 n. 2 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322,

---

**6.** Norfolk determined that the salvage proceeds belonged to Usinor by conducting a computer search for the waybill despite its claim that the waybill could not be located in order to determine the origin of the cargo prior to conducting the salvage sale. (See Affidavit of David Loh, Deposition of Clifford Creech ¶ 8–24, at Exh. G).

106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); *see also Quiroga v. Hasbro, Inc.,* 934 F.2d 497, 500 (3d Cir.1991) (declaring that non-movant may not "rest upon mere allegations, general denials, or ... vague statements"). Thus, if the non-movant's evidence is merely "colorable" or is "not significantly probative," the court may grant summary judgment. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505.

## III. DISCUSSION AND ANALYSIS

Defendant moves for summary judgment arguing that the provision within the shipping agreement which requires that claims for loss are filed within nine months is a condition precedent to recovery and that since Plaintiff filed its claim twenty-two months after the date of delivery, the claim is foreclosed. Plaintiff contends that the nine-month provision within the shipping agreement is unenforceable because Defendant also had a duty under the same agreement to notify of rejected shipments before conducting a salvage sale. Plaintiff further argues that Defendant's freight bill constitutes a representation that delivery of the cargo had been completed such that it interfered with Plaintiff's efforts toward timely filing the claim and warranting estoppel of the nine-month defense, or in the alternative that since Defendants were aware that the shipment was rejected, they had actual or constructive knowledge of the claim.

### A. *Preemption of State Law Claims*

■ As a preliminary matter, Plaintiff's complaint raises state law claims which are preempted by the Carmack Amendment. Although we start with the presumption that Congress does not intend to supplant state law, courts recognize three ways that federal law may preempt or displace state law: (1) express preemption, which requires an express statutory command, (2) field preemption, which requires that a federal law "so thoroughly occupy a legislative field as to make reasonable the inference that Congress left no room for the state to supplant it," and (3) conflict preemption, in which state law makes it impossible to comply with both state and federal law. *Orlick v. J.D. Carton & Son, Inc.,* 144 F.Supp.2d 337, 344 (D.N.J.2001) (citations omitted). The Carmack Amendment to the Interstate Commerce Act was enacted by Congress in 1906, and manifested Congress's intent to "create a national scheme of carrier liability for goods damaged or lost during interstate shipment under a valid bill of lading." *AIDA Dayton Technologies Corp. v. I.T.O. Corp. of Balt.,* 137 F.Supp.2d 637, 641 (D.Md.2001). The Amendment provides that:

(a) A rail carrier providing transportation or service subject to the jurisdiction of the [Transportation] Board ... shall issue a receipt of bill of lading for property it receives for transportation under this part. The rail carrier and any other carrier that delivers the property and is providing transportation or service subject to the jurisdiction of the Board under this part are liable to the person entitled to recover under the receipt or bill of lading. The liability imposed under this subsection is for *actual loss* or injury to the property caused by—

(1) the receiving rail carrier;

(2) the delivering rail carrier; or

(3) another rail carrier over whose line or route the property is transported in the United States.

[49 U.S.C. § 11706(a)](emphasis added).

■ It is generally accepted that the principal purpose of the Amendment was to achieve uniformity, and thus that Congress enacted the amendment to "take possession of the subject of interstate carriers liability ... and supersede all state regulation with reference to liability for lost or damaged property." *Orlick,* 144

F.Supp.2d at 345; *see also Rini v. United Van Lines*, 104 F.3d 502, 504 (1st Cir. 1997). Since Congress intended to occupy the legislative field, the Carmack Amendment preempts "state and common law remedies where goods are damaged or lost in interstate commerce." *Gordon v. United Van Lines, Inc.*, 130 F.3d 282, 288 (7th Cir.1997). Accordingly, Plaintiff's claims for breach of contract, negligence, breach of bailment and conversion are preempted and the Court will consider Plaintiff's plea for relief as one for "actual losses" as provided under the Carmack Amendment, 49 U.S.C. 11706(a). To state a prima facie case for liability and recover for actual losses under the statute, a Plaintiff must show: (1) delivery of the goods to the initial carrier in good condition, (2) damage of the goods before delivery to their final destination, and (3) the amount of damages. *Penske Logistics v. KLLM, Inc.*, 285 F.Supp.2d 468, 472 (D.N.J.2003).

### B. Nine–Month Claim Limitation Provision

The bill of lading in this case, which incorporates the conditions of carriage, contains a nine-month limitation provision. That provision states that "[a]s a condition precedent to recovery claims must be filed in writing with either the origin or destination carrier within nine months from the date of delivery." (Def.'s Statement of Mat. Facts, Uniform Classifications at Exhibit D). Based on that provision, Defendant attempts to enforce the shipping agreement and avoid liability for the difference between the contracted sale price of the coils, $95,402.56, and the amount remaining, $29,526.15, due after salvage of the damaged coils. Plaintiff argues that delay in payment is justified because Defendants failed to notify that the coils were rejected, interfering with Plaintiff's ability to timely file a claim.

In determining the rights and obligations of the parties, the Court looks to the shipping agreement contained within the bill of lading. Although the Carmack Amendment provides the sole remedy and does not permit a cause of action for breach of contract, the bill of lading, which governs a carriers liability, is considered a transportation contract between a shipper and a carrier. *See Tirgan v. Roadway Package Systems, Inc.*, 1995 WL 21098 (D.N.J.)(rejecting federal common law claim for bad faith because the Carmack Amendment "provides the sole remedy of a shipper against a common carrier"); *see also The Paper Magic Group v. J.B. Hunt Transport, Inc.*, 318 F.3d 458, 461 (3d Cir.2003) ("The Carmack Amendment governs the liability of common carriers on bills of lading. A bill of lading is a transportation contract between a shipper/consignee and a carrier"). As a contract, the bill of lading is subject to general rules of construction under contract law, and its terms and conditions are binding. *EF Operating Corporation v. American Buildings*, 993 F.2d 1046, 1050 (3d Cir. 1993)("The bill of lading operates as both the receipt and the basic transportation contract between the shipper and the carrier, and its terms and conditions are binding ... As a contract, it is subject to general rules of construction under contract law"); *Penske*, 285 F.Supp.2d at 473; 80 C.J.S. *Shipping* § 263 (2004)("The original parties to a bill of lading are presumed to know its provisions, and the relations between them are governed thereby").

In setting the terms of a shipping agreement under the Carmack Amendment, a carrier may limit the time for filing a claim, but that limit may cannot be less than nine months. See 49 U.S.C. § 11706(e). Courts have generally required strict compliance with claim filing time-limitation provisions. *See Salzstein v. Be-*

kins Van Lines, Inc., 993 F.2d 1187, 1190 (5th Cir.1993); Landess v. North American Van Lines, Inc., 977 F.Supp. 1274, 1281 (E.D.Tex.1997) ("Unless the shipper complies with the nine-month filing requirement, the claim is barred"). Strict compliance with the nine-month limitation comports with this provision's purpose to "enable[ ] carriers to investigate … claims while the trail is still fresh [and] also to minimize damages." Sanfilippo & Son, Inc. v. Consolidated Rail Corp., 659 F.Supp. 990, 994 (N.D.Ill.1987).

In addition to enforcing the time limitations, courts have also required compliance with written claim filing requirements as stated under the regulations. Under the regulations' minimum filing requirements:

> A written electronic communication (when agreed by the carrier and shipper or receiver involved) from a claimant, filed with a proper carrier within the time limits specified in the bill of lading or contract of carriage or transportation and (1) containing facts sufficient to identify the baggage or shipment s of property (2) asserting the liability for alleged loss, damage, injury, or delay, and (3) making claim for the payment of a specified or determinable amount of money, shall be considered as sufficient compliance with the provisions for filing a claim.

[49 C.F.R. § 1005.2(b)].

Exceptions to the strict compliance rule in both the time limits and the written claim requirements have been recognized. With respect to the nine-month time limitation for filing a claim, an exception is permitted when: (1) the shipper, despite reasonable diligence, is unable to ascertain the extent of loss within the filing period; (2) the carrier's conduct misled the shipper into believing that a timely filing was unnecessary. Salzstein, 993 F.2d at 1191 (citations omitted). The burden then sifts to the carrier to prove it was not negligent. Paper Magic, 318 F.3d at 461. The second of the above exceptions is premised on the equitable theory of estoppel. Under the theory of estoppel, a party may be relieved of the claim limitation when "one party has reasonable relied on the conduct or statements of another [and] the relying party suffer[d] harm as a result of [that] reliance." Id. However, in light of the Carmack Amendment's goal toward uniformity, estoppel has been applied sparingly to circumvent the terms of a bill of lading, and then only to advance the statutory purpose, see Foster Wheeler Energy Corporation v. Daily Express, Inc., 485 F.Supp. 268, 272 (M.D.Pa.1980), and a party may only rely on estoppel when "the party being estopped has taken some affirmative steps to induce the other party into believing that there was no need to file a claim." Landess, 977 F.Supp. at 1282. Thus, in Lehigh Valley Railroad v. State of Russia, 21 F.2d 396 (2d Cir.), the Court held that the carrier could not raise a defense based on misfiling where the railroad agent erroneously instructed the claimant where the claim should be sent. Similarly, in Action Drug Company v. Overnite Transp.Co., 724 F.Supp. 269, (D.Del. 1989) a carrier was equitably estopped from asserting the nine-month limitations period as a defense to a shipper's claim for damages when carrier repeatedly represented that the delivery, which did not reach its destination, had been made.

As to relief from the written claim requirement, courts have permitted relief based upon the theory of estoppel when the carrier's agent has by word or deed induced the plaintiff not to file a claim. See Perini North River Associates v. Chesapeake & Ohio Railway Co., 562 F.2d 269 (3d Cir.1977) (Carriers were estopped from enforcing the written claim requirement where carrier made representations that allegedly waived filing requirement and departed from its normal practice of

forwarding copies of claim and damage report to consignee). The writing requirement has also been excused in cases where it can be shown that the carrier had actual knowledge of damages, thus obviating the need for a written claim. *See Hopper Paper Co. v. Baltimore & O.R. Co.*, 178 F.2d 179 (7th Cir.1949). In *Hopper Paper Co. v. Baltimore & O.R. Co.*, a shipper's load of paper was destroyed in a carrier's railway wreck. The carrier notified the shipper of the loss within days; however, the shipper did not file a claim for losses until eleven months after being notified. The carrier rejected the claim based upon the nine-month claim filing provision contained in the bill of lading. The court held that "failure to give notice of a claim for damages or loss in accordance with a stipulation in a contract for shipping of goods is excused, or is inapplicable, where the carrier has or is chargeable with actual knowledge of all the conditions as to the damages that a written notice could give." *Id.* at 181. Few courts have followed *Hopper* however, and the Third Circuit in *Perini*, although finding that Defendants could not enforce the writing requirement based on estoppel, refused to apply Hopper based on actual knowledge of loss by the carrier, stating:

> Hopper Paper seems misguided only in that its rationale equated actual knowledge with estoppel ... We do not question the accepted rule that actual knowledge cannot substitute for the written notice required by a bill of lading. The estoppel inquiry is not closed, however, simply by virtue of that principle.

[*Perini*, 562 F.2d at 273].

Based on the holding in *Perini*, relief from the nine-month requirement in the Third Circuit must be predicated entirely upon principles of estoppel and not whether a carrier had knowledge of the losses. For this reason, Plaintiff's argument that defendant had actual knowledge that the coils were rejected cannot substantiate a claim for losses. Instead the inquiry must be confined to whether application of estoppel is proper. Plaintiff contends that estoppel is warranted because Defendant's conduct, namely issuing a freight bill for delivery, constituted a misrepresentation that delivery had been completed and that it was not necessary to file a written claim. (See Pl.'s Memorandum in Support of Mot. for S.J. at 7). The Court disagrees. A freight bill can be generated at any time after the shipping agreement and it is likely that invoices for payment are prepared independently of arrangements for shipping. Moreover, courts interpreting the regulations' minimum filing requirements have held that "documents prepared by carriers in the ordinary course of business" do not satisfy the written claim requirement. *Foster Wheeler*, 485 F.Supp. at 272 (letters from carrier relating to salvage value of crane damaged in transit did not satisfy written claim requirements). Those regulations list freight bills and delivery receipts among the documents which do not constitute a written claim. 49 C.F.R. § 1005.2(c)(2003). For this reason, Defendant's freight bill cannot act as a written claim for losses.

Still, Plaintiff might have successfully argued for relief from the nine-month requirement based upon estoppel because of Defendant's failure to notify that the consignee rejected the coils and subsequently sold them at salvage. Despite Defendant's argument that its duty to notify is not established by case law, the parties contract clearly provided for such notice. Defendant can hardly rely upon the nine-month provision to preclude Plaintiff's claim while at the same time resisting its duty under the same contract to notify the shipper before conducting a salvage sale. This proposition is supported by principles

sounding in contract and equity. *See Carlo C. Gelardi Corp. v. Miller Brewing Company*, 502 F.Supp. 637, 652 (D.N.J. 1980) ("it is a principle of New Jersey law that 'Where one party has been guilty of a breach of essential obligations the other party has the right to deem itself discharged from further performance' "); RESTATEMENT (SECOND) OF CONTRACTS § 237 (1981) ("it is a condition precedent of each parties' remaining duties to render performances to be exchanged under an exchange of promises that there be no uncured material failure by the other party to render any such performance due at an earlier time"); *see also, Action Drug*, 724 F.Supp. at 276 (the equitable doctrine of estoppel "should be applied in cases that arise under the Carmack Amendment, 49 U.S.C. § 11707, when application of such principles would further the statutory purpose").

■■ While it is true as Defendant argues, that based on the conditions of carriage the nine month claim filing requirement is a condition precedent to recovery, Defendant's duty to notify preceded Plaintiff's claim filing requirement[7], and it is Defendant who first breached the shipping contract, relieving Plaintiff, under contract principles, of its duty to observe the nine-month provision. But the matter is not settled there. Even if Defendant's own conduct, failing to notify of the rejection and salvage, contributed to Plaintiff's inability to timely file a claim, or if Plaintiff is relieved based on Defendant's breach, the Court is still presented with the problem of determining a reasonable period for Plaintiff to discover the loss, and more importantly, of determining the extent, if any, of the damages.

■■ To begin, Plaintiff's twenty-two month claim filing delay would stretch notions of equity beyond reason. The nine-month claim period begins to run either at the time of actual delivery, or after a reasonable time for delivery has expired. *L & S Bearing Co. v. Randex International*, 913 F.Supp. 1544, 1547 (S.D.Fl.1995). In cases of non-delivery, the nine months begins to run after a reasonable time has elapsed based on the circumstances, whether or not the shipper has actual knowledge of non-delivery.[8] *Imperial News. Co., Inc. v. P–I–E Nationwide, Inc.*, 727 F.Supp. 86, 88 (E.D.N.Y.1989). What constitutes a reasonable time depends upon the circumstances of the case, i.e. "such time as is reasonably necessary conveniently to transport and make delivery of the shipment in the ordinary course of business." *Id.* (citations omitted). In *Action Drug Company v. Overnite Transportation Company*, 724 F.Supp. 269 (D.De. 1989), the Court permitted relief from a

---

7. Ferralloy released the coils to Defendant on May 23, 2000, one day after delivery, and Defendant sold the coils at salvage sometime in June 2000. Defendant's duty to notify Plaintiff of the consignee's rejection and of the subsequent salvage sale was triggered prior to Norfolk salvaging the coils according to the conditions of carriage. Yet Plaintiff's nine-month claim filing duty had not yet expired. Plaintiff was also well within a reasonable period for investigating the disposition of the shipment during this one month period following the intended shipment date.

8. This assertion does not address Plaintiff's position that Defendant had a common law duty to notify of failure to make delivery, or Defendant's counter position that the Court's are split as to whether such a duty exists. Rather, the Court relied on this proposition solely for the purpose of establishing the time for tolling when the nine-month period begins to run. In this case, although the coils were delivered as promised, they were rejected. Therefore, the current scenario cannot properly be characterized as one for non-delivery or one in which the time should be tolled at the date of actual delivery. However, the Court need not address whether Defendant had a common law duty to notify since the shipping agreement provided for that duty.

nine-month provision when a delivery scheduled for September 18, 1986 did not arrive at its destination. The Court allowed at least forty-six days after the intended delivery date to lapse before tolling the nine-month period where Defendant made representations that the delivery had been made. In *Union Carbide Corporation v. Consolidated Rail Corporation*, 517 F.Supp. 1094 (N.D.Ill.1981), the Court, following the *Hopper* decision relieving Plaintiff of formal claim filing requirements where the carrier had actual knowledge of the losses have, allowed as much as three months from the delivery date for Plaintiff to investigate and discover that a shipment was not received and to file a claim for losses. In that case, the shipment was involved in a derailment. Defendant notified Plaintiff of the derailment but falsely claimed the shipment was not damaged and would arrive at its destination. These cases are distinguishable from the present matter because the Defendants, unlike the Defendant in our case, made misrepresentations that contributed to the delay. Further, the delay in filing, in both cases, was much shorter. This Court could find no decision which allowed for thirteen months beyond the nine-month filing period for Plaintiff to discover and act on a loss.

█ In the present case, regardless of whether the Court characterizes this as a case of nondelivery, and allowing Plaintiff additional time to discover that the coils were rejected because of multiple shipments, the Court can imagine no circumstances which would permit a twenty-two month lapse from the date of delivery to the date the claim was filed. Plaintiff should have been on notice as early as June 2000, one month after the coils were shipped, when Feralloy issued a short payment without explanation, that something was wrong with the shipment. Even if the Court allows additional time for Usinor to realize that there was a problem with the shipment in consideration of the customary practice of multiple shipments in this industry, Usinor should have investigated the short payment well before October, 2001, the point at which Usinor's accounting memorandum triggered an investigation by Feralloy. This is especially so in light of the fact that Feralloy's rejection of the cargo and the subsequent salvage was easily uncovered within five months, sometime between October, 2001 and the date of the claim, March, 2002, when a serious investigation was finally undertaken. Had Plaintiff been diligent in its pursuit of payment, the claim could have easily been filed within nine months.

Finally, although the Court prefers to rest its decision to deny relief based on a failure to pursue the claim with diligence in keeping with estoppel requirements, it should also be noted that Plaintiff would likely be unable to recover for lack of damages. The subject coils in this case were apparently damaged at the outset. The ocean bill of lading indicates that the coils were rusted and telescoped before delivery to the Defendant carrier. Defendant could have argued that Plaintiff failed to make a prima facie case under the Carmack Amendment simply because the first prong requires delivery of the goods to the initial carrier in good condition, that is, that the carrier being charged with liability is responsible for their demise. The Court will accept for the purposes of simplicity that the damages Plaintiff alleges are those related to whatever losses might have been incurred from selling the coils at salvage for a lesser amount than Plaintiff might have recovered had it been able to negotiate its own salvage sale. However, even assuming that Plaintiff has established a prima facie case, the Carmack Amendment provides only for *actual losses*. The measure of damages is "the difference between the market value of goods at the time of delivery, and the time when they should have been delivered".

*Paper Magic*, 318 F.3d 458, 461 (3d Cir. 2003). Since the coils were damaged and essentially worthless from the outset, plaintiff's actual losses are confined to the value of the damaged coils at the time of salvage. *Id.* (Worthless goods are those which are "worthless for their intended purpose" or "worth only their salvage value"). Presumably, the ultimate salvage value reflects the worth of the coils, and even if Plaintiff could have sold the coils at a higher salvage rate, the actual loss in this case is not measured from the original sale price, but rather the difference between the salvage amount and whatever higher salvage rate Plaintiff could have obtained. But these are factual inquiries which are not for the Court's speculation on a motion for summary judgment. It is enough that Plaintiff's twenty-two month claim filing lapse is unreasonable and does not permit equitable relief. Accordingly, the Court holds that Plaintiff, having been on notice of a short payment within one month of shipping, failed to pursue its claim with reasonable diligence and is not entitled to equitable relief.

## CONCLUSION

For the reasons expressed above, Plaintiff Usinor's motion for summary judgment is denied. Defendant Norfolk's motion for summary judgment is granted. An appropriate order will follow.